Patrick C. English, Esq. (PE7898)
**DINES AND ENGLISH, L.L.C.**
685 Van Houten Avenue
Clifton, New Jersey 07013
(973) 778-7575
Attorney for Plaintiff, New Jersey Sports Productions, Inc., d/b/a Main Events

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____ : | |
| NEW JERSEY SPORTS PRODUCTIONS, INC., : <br> d/b/a Main Events, : <br> : | Civil Action No.: 14-cv-3038 (VEC) |
|        Plaintiff, : <br> : | **COMPLAINT AND REQUEST FOR <br> JURY TRIAL** |
| v. : <br> : | |
| GROUPE YVON MICHEL, INC., YVON MICHEL, : <br> AL HAYMON, GOLDEN BOY PRODUCTIONS, : <br> INC., SHOWTIME NETWORK, INC., : <br> ADONIS STEVENSON, AND JOHN DOES 1-8, : <br> : | |
|        Defendants. : <br> _____: | |

**NEW JERSEY SPORTS PRODUCTIONS, INC.**, by and through counsel,

hereby alleges by way of complaint:

1)    Plaintiff, New Jersey Sports Productions, Inc. does business under the trade

name of Main Events and hereafter will be referred to as "Main Events" in this

complaint.  Main Events is organized under the laws of the State of New Jersey and has

its principal place of business in that state.

2)    Defendant Groupe Yvon Michel, Inc. is an entity which goes under the acronym "GYM." Upon information and belief, it is incorporated under the laws of the province of Quebec, Canada, where it has its principal place of business.

3)    Defendant Yvon Michel is the principal of GYM and negotiates on its behalf.

4)    Defendant Al Haymon is, upon information and belief, a citizen and resident of the State of Ohio.

5)    Defendant Golden Boy Promotions, Inc. is a corporation having its principal place of business in California. Upon information and belief it is organized under the laws of the State of California. It will be referred to in this complaint as "Golden Boy."

6)    Defendant Showtime Network, Inc. is a wholly owned subsidiary of CBS Corporation. Its principal place of business is in New York and upon information and belief it is organized under the laws of the State of Delaware. It will be referred to in this complaint as "Showtime."

7)    Defendant Adonis Stevenson is a citizen of Canada.

8)    Defendants John Does 1-8 are persons or entities as yet unidentified who are culpable for the acts alleged in this complaint. None reside in or have their principal place of business in the State of New Jersey.

## JURISDICTION

9)    Plaintiff brings this complaint under Federal Diversity Jurisdiction, 28 U.S.C. 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

10)   All defendants do business in the State of New York.

## THE FACTS

A) The Players.

11)   The plaintiff, Main Events, is a major promoter of professional boxing. Among others it promotes Sergey Kovalev, who is the WBO Light Heavyweight Champion of the World. The Chief Executive Officer of Main Events is Kathryn P. Duva.

12)    Defendant GYM is a major boxing promoter headquartered in Canada. It promotes the WBC Light Heavyweight Champion of the World, defendant Adonis Stevenson. Its president is defendant Yvon Michel.

13)    Defendant Al Haymon holds himself out to be a manager or advisor to professional boxers. In point of fact, as we will explain later in this complaint, he actually operates in the role of promoter. He is the owner of an entity named "Al Haymon Development, Inc."

14)    Golden Boy Promotions, Inc. is a major promoter of professional boxing. Its president is Oscar De La Hoya and its CEO is Richard Schaefer. It is common knowledge in the industry that Schaefer is attempting to wrest control of Golden Boy

3

from De La Hoya who is, on information and belief, the majority shareholder. Golden Boy promotes IBF/WBA Light Heavyweight Champion Bernard Hopkins.

15)     Showtime is a pay television network whose Executive Vice President for Sports is Stephen Espinoza. It is the chief competitor to HBO, which is generally considered to be the leading pay network in the United States. Each of Showtime and HBO prominently features boxing on their respective networks.

16)     There are four major sanctioning organizations which recognize titles in boxing. They are the World Boxing Organization "WBO"), the World Boxing Council ("WBC"), the International Boxing Federation ("IBF"), and the World Boxing Association ("WBA").

### B) The Operative Facts Regarding the Negotiations and Agreement Between Main Events and GYM.

17)   For some time prior to November 30, 2013, Kathryn P. Duva and Yvon Michel and representatives of HBO had been in discussions regarding the staging of a fight card on which both Stevenson and Kovalev would appear in their respective title defenses and which would ultimately lead to a major bout between Kovalev and Stevenson.

18)   The first step of that process was agreed upon and Mr. Kovalev defended his WBO title against Ismayl Sillakh and Adonis Stevenson defended his WBC title against Tony Bellew on the same card, held on November 30, 2013. Both fighters defeated their respective opponents by knockout. The concept for having Kovalev and Stevenson on

4

the same card was to build interest in a bout between them. The card was shown on HBO.

19)   Negotiations continued between Ms. Duva and Mr. Michel for a unification title bout between Kovalev and Stevenson to be co-promoted by Main Events and GYM.

20)   Those negotiations between Ms. Duva and Mr. Michel culminated in conversations and an exchange of emails on January 23, 2014 where a co-promotion agreement was reached, with the sequence of events, set forth in sub-paragraphs (A) – (E) below.

(A)   Following a telephone conversation Ms. Duva sent a deal memo reflecting what she believed had been agreed upon. That memo detailed the material points of the co-promotion. That email was sent at approximately 1:53 p.m. At this stage, both parties understood that the deal was subject to the approval of the respective fighters.

(B)   Mr. Michel responded with an email containing some additional less significant points. Mr. Michel's email was sent at approximately 2:48 p.m. on January 23, 2014.

(C)   The exchange of emails covered all material points including how U.S. television revenues were to be split, how Canadian revenues were to be split, how international revenues were to be split, the target date for the fight, and the rights fee which would be acceptable for the bout in discussions with HBO which were contemplated to take place the following day, on January 24, 2014.

(D)   Both promoters were to go to the respective fighters which their companies promoted to gain approval and confirm when they had done so.

5

(E)   Ms. Duva did so, and at roughly 4:27 p.m. on January 23, 2014 wrote by email to Mr. Michel that,

> **"This is acceptable to us.  I have just spoken to Sergey's manager.  We have a deal on our end.**
> **Best**
> **Kathy"**

(F)   Some 3½ hours later Mr. Michel replied to Ms. Duva with the following:

> **"We also have a deal on our side!!:-)**
> **Let's make a good sale to HBO and Peter new! (sic – now).**
> **Can you make sure this between us until we find the most timing to make an announcement?**
> **Tanks. (sic)**
> **See you shortly.**
> **Yvon Michel"**

21)   The reference to "Peter" in Mr. Michel's email was to Peter Nelson, an executive with HBO, with whom Ms. Duva and Mr. Michel were to speak on January 24 in a pre-scheduled call.  Ms. Duva and Mr. Michel had agreed, as part of the exchange of emails, to an acceptable range for a television rights fee for the bout.  As co-promoters their expressed goal was to gain the highest rights fee HBO would pay.

22)   On January 24, 2014, Mr. Michel and Ms. Duva had their conference call with HBO's Peter Nelson.  After some negotiations Mr. Nelson offered a rights fee of 2.4 million dollars for the Kovalev/Stevenson unification bout.

23)   On behalf of the co-promotion Mr. Michel accepted the offer of 2.4 million dollars.  While Ms. Duva was nonplussed by this, believing that a potentially greater amount could be gained if the co-promoters continued the negotiations, she did not wish

to undercut her co-promoter since the HBO offer was within the range previously agreed in writing.

24)  As of January 24, 2014, with the acceptable rights fee offer made to the co-promoters, there was a consummated agreement for a co-promotion Kovalev/Stevenson bout by Main Events and GYM.

25)  On several occasions between January 24 and the ultimate breach of contract by GYM, Mr. Michel and other GYM representatives repeated verbally that there was an agreement in place to co-promote a Stevenson v. Kovalev bout.  Direct representations were made that acceptance had been approved by Mr. Stevenson and his attorney.

26)  One such conversation occurred on February 18, 2014, after defendant Al Haymon had become involved, as will be further explained in future paragraphs. Because of Mr. Haymon's involvement that conversation was memorialized in writing by counsel for Main Events.  In pertinent part, that letter stated:

> **"In light of recent reports regarding the entering of Al Haymon into the Adonis Stevenson picture, as a matter of prudence we find it appropriate to outline our understandings and concerns.**
>
> **To place our concerns in context, <u>we have an agreement for a Stevenson/Kovalev bout for the fall of 2014.</u>**
>
> **The general terms are as outlined in Kathy Duva's email of January 23. <u>You confirmed that agreement in numerous conversations, the last being yesterday evening in a conversation with Ms. Duva.  You have told Ms. Duva that you have informed Mr.  Haymon that we have an agreement for the bout."</u>**

A full copy of the letter is annexed hereto as Exhibit "A."

7

27)  At no time prior to breaching the agreement between Main Events and GYM did Mr. Michel ever contest the contents of that letter or contest that no co-promotion agreement existed.  To the contrary, he continued to assert in conversations with Ms. Duva that a co-promotion deal had been made and, further that Haymon had told him that there was no desire on his part to upset that deal.  Those representations continued into March.

### C) Al Haymon

28)  Al Haymon purports to be variously a manager or advisor to boxers.  For the purpose of Federal Law this is a distinction without a difference as, according to the federal standards governing boxing (the Muhammad Ali Act)  the term "manager" means a person who receives compensation for service as an agent or representative of a boxer. *See*, 15 U.S.C. §6301(5).

29)  In fact, Mr. Haymon's power and actions go well beyond being a manager. He in fact in many instances performs as a promoter, an inconsistent position which is barred by 18 U.S.C. 6308 (b) (creating a mandatory "Firewall between promoters and managers").

30)  He in fact currently has a relationship with Showtime wherein certain promoters rely upon Mr. Haymon for allocation of television dates and rights fees rather than negotiating those dates and fees directly with Showtime.

31)  Haymon has entered into an alliance with Richard Schaefer, the CEO of Golden Boy.  Upon information and belief one object of this alliance is to wrest control of Golden Boy from Oscar De La Hoya for their own financial gain.

8

32)  As part of this scheme, Schaefer has in some instances relinquished and in other instances not required promotional agreements with fighters which Golden Boy has built into attractions, in violation of his fiduciary duties, relying instead only on Haymon's good will, placing the corporation in a weakened position. The concept is for Haymon and Schaefer to use Haymon's fighter contracts to seek financing to both buy out De La Hoya and continue their violation of the Muhammad Ali Act in other respects for their own financial gain.

33)  As part of this scheme, Haymon and Schaefer must show potential investors assets, including fighter contracts, and control of fighters and major fights to show that there is substance to potential investors.  Upon information and belief the potential investors are not sufficiently sophisticated to recognize the illegality under the Muhammad Ali Act, nor that there are potential criminal penalties.  Upon information and belief one investment group which has been contacted is the prominent firm of Wadell & Reed.

34)  It is in connection with this scheme that Mr. Haymon's interference with Main Events' co-promotion agreement for the Stevenson/Kovalev bout becomes relevant.

35)  A management agreement with Adonis Stevenson is obviously a significant asset to show potential investors.  Better still as an asset is an agreement for a major bout between a Golden Boy fighter and Mr. Stevenson.

36)  Upon information and belief, Mr. Haymon connected with Mr. Stevenson through an individual named Rudy Louis.  There is reason to believe that Mr. Louis was compensated for the introduction.

9

37)   After the co-promotion deal for a Kovalev/Stevenson bout had already been agreed upon there came to be rumors of Mr. Haymon's attempted involvement with Mr. Stevenson.  Given Mr. Haymon's reputation and ties to Mr. Schaefer this raised concerns and Ms. Duva expressed those concerns to Mr. Michel. Through the date of the letter to Mr. Michel (Exhibit "A"), Mr. Michel repeatedly assured Ms. Duva that the deal for the Kovalev/Stevenson co-promotion was not in jeopardy but that Haymon was simply attempting to obtain a higher television rights fee for an interim Stevenson bout against a fighter named Fonfara.  Michel stated not only that Mr. Haymon had told him (Michel) that he was satisfied with the Stevenson deal but that Haymon could not legally object due to the existing GYM contract with Stevenson, that Stevenson had previously agreed to the bout and, further, that in any case GYM's contract with Stevenson gave it the right to bind him to the bout.

### D)   Haymon Interference

38)   In point of fact, it was later disclosed that Haymon, with knowledge of the co-promotion deal between GYM and Main Events, was attempting to set up a bout between Stevenson and Golden Boy's fighter, Bernard Hopkins, with Haymon negotiating directly with Showtime to the alleged exclusion of Mr. Michel.  Mr. Michel made this direct statement as regards the site to Ms. Duva and as to Showtime to Peter Nelson of HBO.

39)   Negotiations of this nature, as well as his other activities, squarely place Haymon in the category of promoter as defined in the Muhammad Ali Act 15 U.S.C. §6301 (9).

10

40) In March Main Events learned that GYM had presented a Showtime proposal to HBO pursuant to a "right to match" clause that HBO had in its contract with GYM from the November 11, 2013 bout. Upon information and belief that proposal only included the interim bout, not any subsequent bout.

41) Upon information and belief the proposed rights fee for the interim bout was significantly above market value.

42) In order to protect itself, Main Events sent two letters on March 26, 2014. One was to Mr. Michel. The second was to the Executive Vice President of Showtime in charge of sports programming. In both letters the same point was made, to wit, that Main Events had no interest in the interim bout of Stevenson against a boxer named Fonfara but that Main Events had a binding agreement for a subsequent Kovalev/Stevenson bout. Copies of the two letters are annexed as Exhibits "B" and "C" and are incorporated by reference.

43) By letter of March 28, 2014, counsel for GYM (who, coincidentally, is also the promoter of the opponent Fonfara who will fight Stevenson in the Interim Bout) responded referencing an unconsummated HBO multi-fight agreement. See Exhibit "D." It was not initially clear from that letter whether counsel was referring to a HBO multi-bout agreement, or the Main Events/GYM deal, but it has now been publicly announced that Mr. Stevenson will be fighting Bernard Hopkins in his next bout rather than Sergey Kovalev.

44) Haymon, sometimes through his entity Alan Haymon Development Company, Inc., obtains a power of attorney for boxers and requires that the boxer solely

11

"render services solely and exclusively for ADVISOR and agrees that he will not take

part in or negotiate for any professional boxing contest whatsoever without obtaining the written approval of advisor." (Paragraph 5(c)). Such clauses are common in promotional contracts and less common in management contracts and gives Haymon more than simply "advisory" power. A sample redacted copy of Haymon's "Advisory" contract is annexed as Exhibit "E", but at this point absent discovery we do not know the similarities and differences with the contract he purportedly has with Adonis Stevenson. If it does contain the same terms it would give Haymon veto power over who Stevenson may fight and for what promoter Stevenson will fight. This contract purports to be governed under California law but is violative of California law in several respects.

**E)   Interference by Showtime**.

45)   Stephen Espinoza, Vice President of Showtime, has publicly admitted that he is aware that Main Events/Kovalev is committed contractually to HBO.

46)   Showtime was put on notice as to the specific negotiations between HBO on one hand and Main Events/GYM on the other in which Yvon Michel, on behalf of the co-promotion, expressly accepted the rights fee offered by HBO.

47)   Nonetheless, Showtime made an offer negotiated through Al Haymon to telecast a Stevenson/Hopkins bout with, inter alia, the clear intent of disrupting the Stevenson/Kovalev bout.

**F)   The Bogus Excuse**.

48)   In several interviews and tweets Mr. Michel acknowledged that he had reached terms for a co-promotion of a Stevenson/Kovalev bout between GYM and Main

Events. Hence it was necessary for him to come up with an excuse to refuse to proceed

with the co-promotion.

49)   Each of GYM and Main Events were pursuing a multi-fight deal with HBO. In the business of boxing such multi-bout agreements are generally considered quite desirable and Mr. Michel, on behalf of GYM and Mr. Stevenson stated to HBO that he was desirous of having a multi-bout agreement.

50)   There was, however, no linkage between GYM entering into a multi-bout agreement with HBO and the agreement to co-promote a Kovalev/Stevenson bout.

51)   At no time did Mr. Michel ever suggest to any representative of Main Events that there was linkage between the HBO multi-bout agreement which he was negotiating and the co-promotion agreement to which he had agreed.  That television rights fee is and was available in the 2.4 million dollars agreed to on January 24, 2014 in the conference call with HBO's representative.

52)   As reflected in the exchange of memos between Mr. Michel and Ms. Duva, moving forward with the Kovalev/Stevenson bout was contingent only upon an agreed rights fee for a single bout, to wit, the Kovalev/Stevenson bout.  That rights fee amount was met and agreed upon, and it was Mr. Michel himself who accepted it on behalf of the co-promotion.

53)   Mr. Michel's public position as to why he is not proceeding with the co-promotion for Kovalev/Stevenson bout is, to put it bluntly, an after the fact attempt at legal exculpation, built on a falsehood.

13

54) Main Events is not aware of the details of Mr. Michel's negotiations with HBO for a multi-bout agreement except the knowledge that there was not a tie-in to the Kovalev bout. However, Main Events is aware that HBO claimed it had an agreement with GYM and it has been told to the representatives of Main Events that Mr. Michel has stated by way of attempting exculpation with HBO that Mr. Haymon now has control over Mr. Stevenson's career, not he.

55) The reported factual versions recounted by defendants of the events leading up to this lawsuit are widely divergent. As examples:

-    Yvon Michel has alleged to HBO that he had no conversations with Showtime prior to receipt of a proposal from them and that the proposal had been negotiated by Al Haymon. Yet in response to reporters questioning Espinoza stated his negotiations were "primarily with Yvon Michel."

-    Yvon Michel sent only terms for a single interim bout to HBO to match. Stephen Espinoza, again in response to a reporter's questions, has stated that there is a multi-bout structure in place.

-    As late as February 19 Michel stated to reporters that the Stevenson/Kovalev bout would go forward, despite the involvement of Al Haymon. In point of fact, he has now stated that it will not and that Stevenson will instead be fighting a Golden Boy fighter.

14

## COUNT I

### Breach of Contract Between GYM and Main Events

56)  The allegations of paragraphs 1 through 55 are repeated as though set forth fully herein.

57)  A legally binding contract existed between plaintiff Main Events and defendant GYM to co-promote a bout between Adonis Stevenson and Sergey Kovalev. That contract included the implied covenant of good faith and fair dealing.

58)  Plaintiff has fulfilled all of its obligations under that contract and stands ready to fulfill future obligations.

59)  Defendant GYM has breached its contract with plaintiff.

60)  Plaintiff has suffered damages as a result.

**WHEREFORE,** plaintiff seeks judgment in the amount of its damages.

**WHEREFORE,** plaintiff seeks punitive damages.

**WHEREFORE,** plaintiff seeks costs and counsel fees associated with this suit.

**WHEREFORE,** plaintiff seeks such other relief as the Court may deem just and proper.

## COUNT II

### Breach of Fiduciary Duty by GYM

61)  The allegations of paragraphs 1 through 60 are repeated as though set forth fully herein.

62)  The co-promotion between GYM and Main Events was based, in substantial part, on agreed upon splits of revenue.  Such co-promotions are not uncommon in boxing

15

and are based upon the principle of maximizing revenue to the co-promotion consistent with prudent business practices.

63) A co-promotion of this nature is a joint venture with respect to the event agreed upon.

64) Each party to a joint venture owes a fiduciary duty to the other.

65) GYM breached that fiduciary duty to plaintiff.

66) Plaintiff suffered damages thereby.

**WHEREFORE,** plaintiff seeks judgment in the amount of its damages.

**WHEREFORE,** plaintiff seeks punitive damages.

**WHEREFORE,** plaintiff seeks costs and counsel fees associated with this suit.

**WHEREFORE,** plaintiff seeks such other relief as the Court may deem just and proper.

## COUNT III

### Fraud By Yvon Michel

67) The allegations of paragraphs 1 through 66 are repeated as though set forth fully herein.

68) Yvon Michel made numerous statements to representatives of Main Events. They include the statements that:

a) GYM had full authority to enter into a co-promotion agreement with Main Events, and that the agreement had been approved by Stevenson;

b) That GYM had a contract with Stevenson allowing it to proceed with the co-promotion even in the absence of approval by Stevenson;

16

c)    That he had informed Al Haymon that GYM was in a binding agreement with Main Events and that he would cause GYM to stand by that agreement;

d)    That Main Events "had nothing to worry about" with respect to the Kovalev/Stevenson deal and that there was simply an attempt to increase the rights fee for the unrelated interim bout.

69)    Those statements were false and plaintiff took action and failed to take action in reasonable reliance upon those false statements.

70)    Plaintiff is unable to ascertain at this time prior to discovery which of the above cited false statements were known to defendant Michel to be false at the time made without discovery, however at no time prior to the breach of contract between GYM and Main Events did Michel ever correct any of the above statements and the continued representation that Main Events "had nothing to worry about" constituted a reaffirmation of the earlier statements and was known by Michel to be false when made.

71)    Plaintiff suffered damages thereby.

**WHEREFORE**, plaintiff seeks judgment in the amount of its damages.

**WHEREFORE**, plaintiff seeks punitive damages.

**WHEREFORE**, plaintiff seeks costs and counsel fees associated with this suit.

**WHEREFORE**, plaintiff seeks such other relief as the Court may deem just and proper.

17

## COUNT IV

### Tortious Interference With Contract Against Al Haymon, Golden Boy, Stevenson, Showtime and John Does 1-8

72)  The allegations of paragraphs 1 through 71 are repeated as though set forth fully herein.

73)  Upon Al Haymon becoming Adonis Stevenson's alleged agent, Michel, by his own assertions, informed Al Haymon that GYM was in a contract with Main Events for the co-promotion of a Stevenson/Kovalev bout.

74)  So there would be no misunderstandings, plaintiff caused counsel to send a letter dated February 19, 2014, which was to be transmitted to Haymon by GYM in the event of a threatened breach.

75)  Al Haymon knew or should have known that GYM and Main Events were contracted to co-promote a Kovalev/Stevenson bout.

76)  According to Yvon Michel and GYM's agents, Adonis Stevenson had approved the contract between GYM and Main Events to co-promote a Kovalev/Stevenson bout, hence Stevenson knew or should have known of the contract.

77)  Even if it had been unaware from prior publicity, Showtime was placed on notice via letter dated March 26, 2014 of the agreement between GYM and Main Events to promote a Stevenson/Kovalev bout.

78)  Richard Schaefer announced that Golden Boy would promote or co-promote an Adonis Stevenson bout which would take place in lieu of a Stevenson/Kovalev bout. This announcement came after it was known publicly that Main Events had asserted its

18

contract rights with respect to a co-promotion with GYM for a Stevenson/Kovalev bout. Further on information and belief, Schaefer was collaborating with Haymon during the entire set of events described in this complaint as set forth elsewhere in this complaint.

79)   Golden Boy is responsible for the actions of Schaefer through the principle of respondeat superior.

80)   Stevenson interfered with the agreement between Main Events and GYM to co-promote a Stevenson/Kovalev bout by refusing to proceed with the bout with the knowledge that there was any agreement between GYM and Main Events which he had approved.

81)   Haymon and Golden Boy, through Schaefer, interfered with the contract between GYM and Main Events to co-promote a Stevenson bout by negotiating an alternate bout and convincing GYM to agree to the alternate bout in derogation of its contract with Main Events and convincing Stevenson to engage in the alternate bout.

82)   Showtime, by making an offer to Yvon Michel to telecast an alternate event inconsistent with the co-promotion of a Stevenson/Kovalev bout induced GYM to breach its agreement with Main Events.

83)   All interfering defendants, Haymon, Stevenson; and Golden Boy, Showtime and John Does 1-8 (parties yet unidentified) operated in bad faith and without legal justification or excuse, to cause GYM to breach its contract with Main Events.

84)   Main Events suffered damages by virtue of the actions of defendants.

WHEREFORE, plaintiff seeks judgment in the amount of its damages.

WHEREFORE, plaintiff seeks punitive damages.

19

WHEREFORE, plaintiff seeks costs and counsel fees associated with this suit.

WHEREFORE, plaintiff seeks such other relief as the Court may deem just and proper.

## COUNT V

### Interference with Prospective Economic Advantage Against Haymon, Golden Boy, Stevenson, Showtime and John Does 1-8 (An Alternate Pleading if No Contract is Found)

85)   The allegations of paragraphs 1 through 84 are repeated as though set forth fully herein.

86)   Haymon, Stevenson, Golden Boy, Showtime and John Does 1-8 were aware of the business relationship between plaintiff and GYM which would have economically benefitted plaintiff.

87)   There was a reasonable expectation that plaintiff would have economically benefitted from the business relationship.

88)   Haymon, Stevenson, Golden Boy, Showtime and John Does 1-8, acting individually and/or in concert interfered with that relationship using dishonest, unfair and/or improper means.

89)   As a result of the actions of these defendants the relationship was injured, causing damage to plaintiff.

WHEREFORE, plaintiff seeks judgment in the amount of its damages.

WHEREFORE, plaintiff seeks punitive damages.

WHEREFORE, plaintiff seeks costs and counsel fees associated with this suit.

**WHEREFORE**, plaintiff seeks such other relief as the Court may deem just and proper.

BY: _____

PATRICK C. ENGLISH (PE7898)
**DINES AND ENGLISH, L.L.C.**
685 Van Houten Avenue
Clifton, New Jersey 07013
(973) 778-7575
Attorney for Plaintiff,
New Jersey Sports Productions, Inc.,
d/b/a Main Events

Date:  April 28, 2014

**JURY DEMAND**

Demand is hereby made for trial by jury.

BY: _____

PATRICK C. ENGLISH (PE7898)
**DINES AND ENGLISH, L.L.C.**
685 Van Houten Avenue
Clifton, New Jersey 07013
(973) 778-7575
Attorney for Plaintiff,
New Jersey Sports Productions, Inc.,
d/b/a Main Events

Date:  April 28, 2014

21

# EXHIBIT A

# DINES AND ENGLISH, L.L.C.

ATTORNEYS AT LAW

685 VAN HOUTEN AVENUE

CLIFTON, NEW JERSEY 07013

———

(973) 778-7575

FACSIMILE

(973) 778-7633

PATRICK C. ENGLISH
Email: dinesandenglish@aol.com
ALSO ADMITTED IN
THE UNITED STATES
DISTRICT COURTS FOR THE
SOUTHERN DISTRICT OF
NEW YORK AND CONNECTICUT

AARON DINES
(1923-2002)

———

JASON M. SANTARCANGELO
Email: jsdinesandenglish@verizon.net
OF COUNSEL
ALSO ADMITTED IN NEW YORK

February 19, 2014

**<u>VIA EMAIL/PDF</u>**

Yvon Michel, President
Goupe Yvon Michel
10172 Boul St-Laurent
Montréal  QC H3L  2N8
Canada

Dear Yvon:

As you are aware, we represent New Jersey Sports Productions, Inc., d/b/a Main Events.

In light of recent reports regarding the entering of Al Haymon into the Adonis Stevenson picture, as a matter of prudence we find it appropriate to outline our understanding and concerns.

To place our concerns in context, we have an agreement for a Stevenson/Kovalev bout for the fall of 2014. The general terms are as outlined in Kathy Duva's email of January 23. You confirmed that agreement in numerous conversations, the last being yesterday evening in a conversation with Ms. Duva.

However, we are very troubled by the potential here for third party interference with our agreement.

You have told Ms. Duva that you have informed Mr. Haymon that we have an agreement for the bout. Obviously we were all surprised at his entering into the picture, but from our perspective we will not tolerate any third party interference with our deal.

DINES AND ENGLISH, L.L.C.
ATTORNEYS AT LAW

**Yvon Michel, President**
**Goupe Yvon Michel**
**February 19, 2014**
**Page 2**

        As you are in contact with Mr. Haymon, if you perceive any interference with our
deal please feel free to convey the substance of this letter to him.

                                Very truly yours,

                                **DINES AND ENGLISH, L.L.C.**

                        BY:     _____
                                PATRICK C. ENGLISH

/mat
C:  Kathryn P. Duva, Esq.
     Leon Margules, Esq.

# EXHIBIT B

DINES AND ENGLISH, L.L.C.

ATTORNEYS AT LAW

685 VAN HOUTEN AVENUE

CLIFTON, NEW JERSEY 07013

————

(973) 778-7575

FACSIMILE

(973) 778-7633

PATRICK C. ENGLISH
Email: dinesandenglish@aol.com
ALSO ADMITTED IN
THE UNITED STATES
DISTRICT COURTS FOR THE
SOUTHERN DISTRICT OF
NEW YORK AND CONNECTICUT

AARON DINES
(1923-2002)

————

JASON M. SANTARCANGELO
Email: jsdinesandenglish@verizon.net
OF COUNSEL
ALSO ADMITTED IN NEW YORK

March 26, 2014

**VIA EMAIL/PDF**

Yvon Michel, President
Goupe Yvon Michel
10172 Boul St-Laurent
Montréal  QC H3L  2N8
Canada

Dear Mr. Michel:

As you know we represent New Jersey Sports Productions, Inc., d/b/a Main Events.

We understand that you are about to announce a Stevenson bout against Andrej Fonfara, which is to be telecast on Showtime.  Main Events has no interest in that bout.

However, we wish to make it perfectly clear that should Mr. Stevenson prevail in that bout, and should Mr. Kovalev prevail in his bout, we intend to enforce the binding agreement between Main Events and Goupe Yvon Michel for a Stevenson/Kovalev bout.

On January 23rd there were two relevant exchanges of emails.  The first set out terms of a deal and your response added some additional terms.  You were careful to state that you needed to clear the deal with Mr. Stevenson, as Main Events did with Mr. Kovalev.

Main Events cleared the deal with Mr. Kovalev and informed you in an email from Kathy Duva to you.

DINES AND ENGLISH, L.L.C.
ATTORNEYS AT LAW


Yvon Michel, President
Goupe Yvon Michel
March 26, 2014
Page 2


Later that evening you responded unequivocally – "We also have a deal on our side." You simply asked that the consummation of the deal be kept confidential "until we find the best timing to make an announcement." Both you and your representatives further informed us that the deal had been approved by Mr. Stevenson and, further, that your deal with Mr. Stevenson was far in excess of what your contract with him required.

In the exchange of memos, reference was made to an acceptable range for an HBO rights fee for the bout. HBO offered a rights fee within that range and you accepted.

You informed Ms. Duva as late as February 18 that Main Events and GYM had a deal. That conversation was memorialized in writing the following day.

There is a binding agreement. Any failure to perform under that agreement would be a breach of contract. Main Events, as you well know, has a policy of enforcing its rights and does not intend to deviate from that policy here.

Please be guided accordingly.

All rights are reserved.

Very truly yours,

DINES AND ENGLISH, L.L.C.

BY:
PATRICK C. ENGLISH

/mat
C: Kathryn P. Duva, Esq.
   Leon R. Margules, Esq.

# **EXHIBIT C**

DINES AND ENGLISH, L.L.C.

ATTORNEYS AT LAW

685 VAN HOUTEN AVENUE

CLIFTON, NEW JERSEY 07013

PATRICK C. ENGLISH
Email: dinesandenglish@aol.com
ALSO ADMITTED IN
THE UNITED STATES
DISTRICT COURTS FOR THE
SOUTHERN DISTRICT OF
NEW YORK AND CONNECTICUT

(973) 778-7575
FACSIMILE
(973) 778-7633

AARON DINES
(1923-2002)

JASON M. SANTARCANGELO
Email: jsdinesandenglish@verizon.net
OF COUNSEL
ALSO ADMITTED IN NEW YORK

March 26, 2014

**VIA EMAIL/PDF**

Stephen B. Espinoza, Esq.,
Executive VP & General Manager
Showtime Networks, Inc.
1633 Broadway
New York, New York 10019

Dear Stephen:

As you know, we represent New Jersey Sports Productions, Inc., d/b/a Main Events.

We understand that there is about to be an announcement that Mr. Stevenson is to engage in a bout against Mr. Fonfara on Showtime.

Main Events has no interest in that bout and wish all involved the best. However, please be advised that there exists a binding agreement for Mr. Stevenson to engage with Mr. Kovalev in his next bout after the Fonfara bout, assuming that both he and Mr. Kovalev win there next bouts.

It is important that you know that on January 23rd there were both discussions and emails between Kathy Duva, CEO of Main Events, and Yvon Michel, CEO of GYM.

The first exchange of emails set forth the material deal points. Mr. Michel stated that he wished to clear the points with Mr. Stevenson and Main Events wished to do so with Mr. Kovalev.

There was a second set of emails later that day. After Mr. Michel and Ms. Duva had the opportunity to consult Ms. Duva informed Mr. Michel that Mr. Kovalev had approved. Later that night Mr. Michel replied "We also have a deal on our side!!" Mr. Michel requested that the existence of the agreement be kept "between us until we find the best timing to make an announcement!" Mr. Michel and his representatives also informed us verbally that Mr. Stevenson had approved the deal and further, that the amount

DINES AND ENGLISH, L.L.C.
ATTORNEYS AT LAW


Stephen B. Espinoza, Esq.
March 26, 2014
Page 2


Mr. Stevenson was to receive exceeded the amounts in Mr. Stevenson's promotional contract and thus he had authority to proceed even if Mr. Stevenson had not agreed.

The deal was contingent upon HBO offering a rights fee which was within a pre-agreed range (which was part of the deal memos exchanged on January 23rd). HBO did so in a conference call the following day and Mr. Michel expressly agreed to the rights fee.

Consequently at least as of January 23rd (but no later than January 24th) there was a binding deal between the parties. As late as February 18th Mr. Michel confirmed that there was an agreement. That conversation was memorialized in writing.

Main Events has a binding contract to co-promote a Stevenson/Kovalev bout. Main Events intends to enforce that agreement.

We want there to be no misunderstanding here.

Main Events has no interest in the Stevenson/Fonfara bout. However, we have a binding agreement to co-promote the next bout (Stevenson/Kovalev) and it is my understanding that HBO has informed Mr. Michel that it believes it has a binding agreement. Main Events intends to honor its agreements and intends to enforce its rights, if necessary, to cause others to honor theirs. Hence any deals for a future Stevenson deal after Fonfara would be a tortious interference with Main Events' rights and Showtime should be guided accordingly.

All rights are reserved.


                                        Very truly yours,

                                        DINES AND ENGLISH, L.L.C.

                            BY:     _____
                                        PATRICK C. ENGLISH

/mat
C: Kathryn P. Duva, Esq.

# **<u>EXHIBIT D</u>**

**Law Offices of LEON R. MARGULES, PA.**
5397 ORANGE DRIVE, SUITE 202
DAVIE, FLORIDA 33314
TELEPHONE: 954-587-0482
FACSIMILE: 954-583-7447
EMAIL: *marguleslaw@yahoo.com*

March 28, 2014

Patrick C. English, Esquire
Dines and English, LLC
685 Van Houten Avenue
Clifton, NJ 07013
Facsimile: 973-778-7633
Email: dinesandenglish@aol.com

RE:     Adonis Stevenson

Dear Mr. English,

Our client has requested that we respond to your letter dated March 26, 2014 concerning Adonis Stevenson.

We have read your letter, and reviewed all of the emails mentioned, as well as other documents with regards to this matter. We have also spoken to other parties that were involved. Our investigations reveals that no deal was ever consummated, no performance in reliance on a deal ever occurred, and Mr. Stevenson never agreed to the HBO offer for the Multi Fight deal.

There were and still are several contingencies that have to occur before the parties herein could have attempted to finalize an Agreement and make it enforceable under the law.

As you know, this office will protect our client's interests and take any action necessary to protect those interests, including joining all the parties involved, and including seeking redress if they are wrongfully sued in an action that has no merit.

Main Events may have a policy of enforcing its rights, but we hope that policy does not include bringing actions where it has no appreciable chance of prevailing.

We hereby reserve all of our client's legal rights and remedies.

Sincerely,

Leon R. Margules, Esquire

cc.     Yvon Michel
        Peter Nelson
        Peter Mozarsky
        Jonathan Galst

# **EXHIBIT E**

# EXCLUSIVE ADVISORY A G R E E M E N T

THIS AGREEMENT, effective as of the        day of March 2012, between
                '; hereinafter referred to as "ATHLETE", and **Alan Haymon Development Inc.** hereinafter referred to as "ADVISOR".

# W I T N E S S E T H:

For and in consideration of the mutual promises, covenants, representations, agreements and conditions as set forth herein, the parties hereto agree as follows:

1. ## EXCLUSIVE ADVISORY RIGHTS

    A. ADVISOR shall have the sole and exclusive right to render services on behalf of ATHLETE in connection with ATHLETE's participation in professional boxing contests or exhibitions and in connection with ATHLETE's participation in entertainment performances, personal appearances and endorsement and /or sponsorship opportunities arising out of or related in any way to ATHLETE's boxing career.

    B. ADVISOR hereby agrees to (a) advise and counsel ATHLETE in the development and advancement of his professional boxing career; (b) exercise best efforts to secure remunerative boxing contests and/or exhibitions; (c) secure proper training facilities and equipment for ATHLETE; (d) publicize and promote the talents and abilities of ATHLETE through the various forms of media, and (e) attempt to secure commercial endorsements, personal appearances and/or performances as a performer in movies, stage, radio, television, or forms of media or entertainment.

To secure such ends, ATHLETE herby makes and appoints ADVISOR as his agent and attorney-in-fact for him and in his name to execute and deliver such contracts on behalf of ATHLETE, subject to the written approval of ATHLETE.

2. ## TERM OF AGREEMENT

    A. **Original Term:** The Original Term of the Agreement shall be for three (3) years beginning on the date of the first fight after the effective date of this Agreement, subject to Paragraphs to 2B and 2C, herein. The Original Term and any extension periods are, collectively, the "Term."

    B. **Extension of Term:** If at any time during the Term of this Agreement, ATHLETE becomes physically, mentally or legally incapacitated to such an extent that he is rendered unable to participate in professional boxing

contests, then for purposes of computation of the expiration periods of this Agreement, the Term of this Agreement shall be deemed to be automatically suspended for the period of time during which ATHLETE is incapacitated as defined above. Such period shall be automatically added to the Term of this Agreement.

**C.**

i. In the event that ATHLETE, during the Original Term of this Agreement, earns aggregate purses in excess of _____ ($   ), the original term of this Agreement shall be extended for a period of two (2) years.

ii. If at any time during the Original Term of this Agreement ATHLETE enters into a Multi-fight Agreement with a Media Outlet, the Original Term of this Agreement shall be extended for a period of two (2) years or for a period sufficient to make the Term of this Agreement coterminous with the term of the Media Agreement, whichever is longer.

iii. The Term shall be subject to all applicable State and Federal laws and may not be for a term inconsistent with said laws, but in all other respect shall be valid and binding upon all the parties. Under no circumstances shall the term of this Agreement exceed seven years beyond the Effective Date of the Agreement.

3.    **ADVISOR'S COMPENSATION**

ADVISOR's compensation for the services he shall render pursuant to this Agreement shall be fifteen percent (15%) of all sums of money and other remuneration in any form whatsoever paid or credited to ATHLETE for his participation in professional boxing contests and/or exhibitions and other endorsement/sponsorship and personal appearances. Said fifteen percent (15%) shall be payable only for bouts for which ATHLETE receives a minimum purse of $100,000 or greater.

4.    **REPRESENTATIONS AND WARRANTIES**

**A.** ADVISOR agrees that he can not and will not cause ATHLETE to become legally bound to take part in professional boxing contests and/or exhibitions including entertainment performances, personal appearances, endorsements and/or sponsorship without the prior written approval of ATHLETE.

**B.** ADVISOR agrees not to incur any expenses on behalf of ATHLETE without ATHLETE's prior approval. The selection of the head trainer is at the sole discretion of the ATHLETE.

C. During the Term of this Agreement, ATHLETE agrees to render services solely and exclusively for ADVISOR and agrees that he will not take part in or negotiate for any professional boxing contests whatsoever without first obtaining the written approval of ADVISOR.

D. ATHLETE hereby represents and warrants that he is free to enter into this Agreement and that this Agreement does not breach or violate any other Agreements to which ATHLETE is a party. ATHLETE hereby expressly agrees to indemnify and hold ADVISOR harmless against any damages, liabilities, costs, or expenses (including legal fees and expenses) incurred by or threatened against ADVISOR as a result on any breach of these representations and warranties.

E. ADVISOR hereby represents and warrants that he is free to enter into this Agreement and that this Agreement does not breach or violate any other Agreements to which ADVISOR is a party. ADVISOR hereby expressly agrees to indemnify and hold ATHLETE harmless against any damages, liabilities, costs, or expenses (including legal fees) incurred by or threatened against ATHLETE as a result on any breach of these representations and warranties.

F. ATHLETE acknowledges that the ADVISOR has no present or future responsibilities or duties with respect to the conduct of ATHLETE's personal financial and business affairs and that the ADVISOR's duties are limited solely to Boxing and Entertainment related matters. ATHLETE expressly agrees to indemnify and hold ADVISOR harmless against any damages, liabilities, costs or expenses (including legal fees) with respect to any claims or litigation relating to said personal financial and business affairs.

5.   **SEVERABILITY**

It is understood and agreed by the parties hereto that if any section, term or provision of this Agreement is held by any court or other applicable authority having jurisdiction to be illegal or in conflict with any local law or policy of any State, Province, or County where ATHLETE is required to perform, the validity of the remaining portions or provisions shall not be affected and the rights and obligations of the parties shall be construed as if the Agreement did not contain the particular section, term or provision held to be invalid.

6.   **ENTIRE AGREEMENT**

This Agreement constitutes the entire Agreement between the parties. All other Agreements related hereto that are not contained herein are hereby terminated.

## 7.   NO ORAL MODIFICATION OR CHANGES

This Agreement may not be enlarged, modified, or altered except in writing by the party or parties to be charged therewith.

## 8.   EXECUTION OF FURTHER PAPERS

The parties hereto recognize and acknowledge that the rules and regulations of the various state, country, territorial Athletic Commissions and/or sanctioning organizations differ and are sometimes inconsistent. Therefore, each party to this Agreement agrees to execute and to deliver any additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all the terms, provisions, and conditions of this Agreement, and the transactions contemplated by this Agreement.

## 9.   UNIQUE SERVICES-INJUNCTIVE RELIEF

(a)   ATHLETE hereby acknowledges and agrees that the services as set forth in this Agreement as rendered by him are of a special, unusual and extraordinary character, giving them particular value, the loss of which could not be reasonably and adequately compensated by damages in an action at law. ATHLETE therefore agrees that ADVISOR shall be entitled to injunctive and other equitable relief to prevent any material breach or default by ATHLETE hereunder, which shall be in addition to and without prejudice to any other rights or remedies that ADVISOR may have.

(b)   ADVISOR hereby acknowledges and agrees that the services as set forth in this Agreement as rendered by him are of a special, unusual and extraordinary character, giving them particular value, the loss of which could not be reasonably and adequately compensated by damages in an action at law. ADVISOR therefore agrees that ATHLETE shall be entitled to injunctive and other equitable relief to prevent any material breach or default by ADVISOR hereunder, which shall be in addition to and without prejudice to any other rights or remedies that ATHLETE may have.

## 10.   CHOICE OF LAW

The parties acknowledge that this Agreement has been negotiated and entered into in the State of Ohio. Notwithstanding the foregoing, the parties agree that the laws of the State of California applicable to contracts executed and to be fully performed in the State of California shall govern this

Agreement. Further, execution of this Agreement shall constitute each party's agreement that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Los Angeles, California before a single arbitrator administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. The reasonable attorneys' fees, as determined by the Arbitrator, of the prevailing party shall be paid by the non-prevailing party. The award or decision rendered by the arbitrator shall be final, binding and conclusive, and judgment may be entered upon such award by any court having jurisdiction.

11.    **NOTICE**

Any notice provided for under this Agreement shall be given in writing and shall be addressed and sent by registered or certified mail, return receipt requested, postage prepaid and by confirmed fax as follows:

**ATHLETE:**

**COPY TO:**

**ADVISOR:**    **Alan Haymon Development Inc.**
               **16030 Ventura Boulevard, Suite 380**
               **Encino, California 91436**
               **(fax 818-990-0059)**

**COPY TO:**

It is the duty and responsibility of each party to notify the other parties to this Agreement of any address changes for purposes of notice and service.

**13.   TERMINATION**

    **A.**   ADVISOR shall have the right to terminate this Agreement immediately upon (a) a material breach of this Agreement by ATHLETE, (b) written notice to ATHLETE of a material breach of this Agreement by ATHLETE, and (c) ATHLETE'S failure to cure any such breach within thirty (30) days of receipt of such written notice.

    **B.**   If either party commits, or is indicted for, or a complaint is filed against a party for committing a criminal act or offence under any federal, state or local law, the other party may, at his sole discretion, in addition to any other rights he may have at law, terminate this Agreement without any further obligation.

    **C.**   ATHLETE shall have the right to terminate this Agreement immediately upon: (a) a material breach of this Agreement by ADVISOR, (b) written notice to ADVISOR of a material breach of this Agreement by ADVISOR, and (c) ADVISOR'S failure to cure any such breach within thirty (30) days of receipt of such written notice.

**14.   NON-EXCLUSIVITY**

Nothing herein shall prevent ADVISOR from managing or advising any other fighter in any weight class.

**15.   ASSIGNMENT**

Either party may assign his rights and obligations under this Agreement to any other entity in which he shall have ownership interests, so long as it will not have the effect of abrogating the personal service each party agrees to provide hereunder.

**16.   INDEPENDENT CONTRACTORS**

The parties acknowledge that they have entered into the business arrangement described in this Agreement as independent contractors and not as employer and employee, partners, principal and agent, or joint venturers, and, accordingly, this Agreement shall not be cited or relied upon by the parties hereto or any third party as creating any business relationship between the parties other than that of independent contractors.

**17.   SECTION HEADINGS**

The headings of articles, sections and other subdivisions hereof are inserted only for the purpose of convenient reference. Such headings shall not be

deemed to govern, limit, modify, or in any other manner affect the scope, meaning or intent of the provisions of this Agreement or any part or portion thereof, nor shall they otherwise be given any legal effect. Additionally, this Agreement shall not be construed against the party causing its preparation but shall be construed as if all parties prepared this Agreement equally.

18.   **ATHLETE'S LEGAL REPRESENTATION**

**ATHLETE HEREBY ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY ADVISOR, AND GIVEN AMPLE OPPORTUNITY BY ADVISOR, TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING THIS AGREEMENT.**

**ACCEPTED AND AGREED BY THE PARTIES HERETO:**

_____          _____

**ATHLETE:**                     **ADVISOR:**

                                 **Alan Haymon Development, Inc.**


**DATED:**_____        **DATED:**_____

7