UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

NEW JERSEY SPORTS PRODUCTIONS, INC.,
d/b/a Main Events

                                      Plaintiff,

                 -against-

GROUPE YVON MICHEL, INC., YVON MICHEL,
AL HAYMON, GOLDEN BOY PRODUCTIONS,
INC., SHOWTIME NETWORK, INC.,
ADONIS STEVENSON, RICHARD SCHAEFER,
AND JOHN DOES 1-8

                              Defendants.

--------------------------------------------------------------------- X

14-cv-3038 (VEC)

**ORAL ARGUMENT
REQUESTED**


**MEMORANDUM OF AL HAYMON, SHOWTIME NETWORKS INC.,
ADONIS STEVENSON, AND RICHARD SCHAEFER
IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 5

    A.       The Purported Contract Between Main Events and GYM ...................................... 5

    B.       The Purported Interference .................................................................................... 7

          1.       Haymon & Schaefer ...................................................................................... 7

          2.       Showtime ........................................................................................................ 9

          3.       Stevenson .................................................................................................... 10

ARGUMENT ..................................................................................................................... 10

I.       NEW JERSEY LAW GOVERNS BOTH TORTIOUS INTERFERENCE
       CLAIMS ................................................................................................................ 10

II.      BOTH TORTIOUS INTERFERENCE CLAIMS SHOULD BE DISMISSED ............... 11

    A.       Main Events Has Failed to Adequately Allege the Existence of a Contract ......... 12

    B.       The Complaint Should Also Be Dismissed Because Plaintiff Fails to
          Adequately Allege Malice and Intent ................................................................... 17

          1.       The Malice and Intent Requirements ......................................................... 18

          2.       Competition and Pursuing One's Economic Interests are Not
               Tortious Interference ................................................................................... 19

          3.       The Movants' Alleged Conduct Cannot Sustain Either Tort Claim .......... 20

               (a)     Haymon & Schaefer .................................................................... 20

               (b)     Showtime ..................................................................................... 22

                (c)     Stevenson .................................................................................... 23

CONCLUSION .................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

CASES                                                                    Page(s)

*Alboyacian v. BP Prods. N. Am., Inc.*,
    No. 9 Civ. 5143, 2011 WL 5873039 (D.N.J. Nov. 22, 2011)........................................*passim*

*Beals v. Bank of Am., N.A.*,
    No. 10 Civ. 5427, 2011 WL 5415174 (D.N.J. Nov. 4, 2011)...........................................12, 13

*Bloch v. Xanau Liu*,
    No. 11 Civ. 2055 (SRC), 2011 WL 1547513 (D.N.J. Apr. 21, 2011) ..............................14, 15

*Bressman v. J&J Specialized, LLC*,
    No. A-5550-11T1, 2013 WL 6331714 (N.J. Super. Ct. App. Div. Dec. 6, 2013)..................12

*Brooklyn 13th St. Holding Corp. v. Nextel, Inc.*,
    495 F. App'x 112 (2d Cir. 2012) ...........................................................................................12

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*,
    256 F. Supp. 2d 249 (D.N.J. 2003) ........................................................................................11

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ...........................................................................................5 n.3

*Cioffi v. City of Jersey City*,
    No. A-0660-10T3, 2011 WL 4916375 (N.J. Super. Ct. App. Div. Oct. 18, 2011)..................14

*Cotter v. Newark Hous. Auth.*,
    422 F. App'x 95 (3d Cir. 2011) ................................................................................13, 14, 17

*DiFolco v. MSNBC Cable LLC*,
    622 F.3d 104 (2d Cir. 2010)........................................................................................18 n.12

*DiMaria Constr. Inc. v. Interarch*,
    799 A.2d 555 (N.J. Super. Ct. App. Div. 2001)...........................................................18 n.13

*Discover Group, Inc. v. Lexmark Int'l, Inc.*,
    333 F. Supp. 2d 78 (E.D.N.Y. 2004) ....................................................................................11

*Fintech Consulting v. Clearvision Optical Co.*,
    No. 12 Civ. 4956 (DMC)(JAD), 2013 WL 1845850 (D.N.J. Apr. 30, 2013).........................24

*Foxtons, Inc. v. Cirri Germain Realty*,
    No. L-1421-06, 2008 WL 465653 (N.J. Super. Ct. App. Div. Feb. 22, 2008) .................19, 20

*Frank v. Coldwell Banker Schlott Inc.*,
  No. 94 Civ. 8181 (MGC), 1995 WL 479441 (S.D.N.Y. Aug. 14, 1995) ...............................14

*Gaelick v. Conn. Gen. Life Ins. Co.*,
  No. 11 Civ. 2464 (SRC), 2011 WL 3794228 (D.N.J. Aug. 25, 2011)......................17 n.11, 19

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
  201 F. Supp. 2d 236 (S.D.N.Y. 2002),
  *rev'd in part on other grounds*, 386 F.3d 485 (2d Cir. 2004)..................................................11

*Johnson & Johnson v. Guidant Corp.*,
  No. 06 Civ. 7685 (RJS), 2010 WL 571814 (S.D.N.Y. Feb. 16, 2010)............................11, 19

*Kasower v. Gutowitz*,
  No. 00 Civ. 9011 (JGK), 2001 WL 1488440 (S.D.N.Y. Nov. 21, 2001) ...............................13

*Kunica v. St. Jean Fin., Inc.*,
  No. 97 Civ. 3804 (RWS), 1998 WL 437153 (S.D.N.Y. Aug. 3, 1998)...................................15

*Lamorte Burns & Co., v. Walters*,
  770 A.2d 1158 (N.J. 2001)....................................................................................... 18 & n.13

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993)...............................................................................................18

*Masefield AG v. Colonial Oil Indus.*,
  No. 05 Civ. 2231 (PKL), 2006 WL 346178 (S.D.N.Y. Feb. 15, 2006)...................................23

*Moose Mountain Toymakers Ltd. v. Majik Ltd.*,
  No. 10 Civ. 4934 (DMC)(JAD), 2011 WL 3625057 (D.N.J. Aug. 12, 2011) .......................20

*Mu Sigma v. Affine, Inc.*,
  No. 12 Civ. 1323 (FLW), 2013 WL 3772724 (D.N.J. July 17, 2013)..............................19, 22

*New Skies Satellites, B.V. v. Home2US Commc'ns., Inc.*,
  No. 13 Civ. 0200 (PGS), 2014 WL 1292218 (D.N.J. Mar. 28 2014)....................................18

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
  563 A.2d 31 (N.J. 1989)................................................................................. 11, 18 & n.13

*Prudential Ins. Co. of Am. v. Hilton Hotels Corp.*,
  No. 95 Civ. 5575 (KMW), 1996 WL 340002 (S.D.N.Y. June 19, 1996)...............................14

*R.A. Intile Realty Co., v. Raho*,
  614 A.2d 167 (N.J. Super. Ct. L. Div. 1992) .......................................................................18

*Reddington v. Staten Island Univ. Hosp.*,
  511 F.3d 126 (2d Cir. 2007)........................................................................................5 n.3

*Weichert Co. Realtors v. Ryan*,
   608 A.2d 280 (N.J. 1992).......................................................................................................14

*Woods Corp. v. Signet Star Holdings, Inc.*,
   910 F. Supp. 1019 (D.N.J. 1995) ..........................................................................................18

On behalf of defendants Al Haymon ("Haymon"), Showtime Networks Inc. ("Showtime"), Adonis Stevenson ("Stevenson"), and Richard Schaefer ("Schaefer") (together, the "Movants"), we respectfully submit this memorandum of law in support of their motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), the two counts (Counts IV and V) in which they are named in the amended complaint ("complaint" or "Compl.") filed by plaintiff New Jersey Sports Productions, Inc. ("Main Events").[1]

## PRELIMINARY STATEMENT

Adonis Stevenson is a 36-year-old professional boxer, who fought his way to become the World Boxing Council Light Heavyweight Champion. While a boxer's livelihood of course depends on his ability to secure the most competitive fight offers he can during his finite and risky career, the complaint remarkably challenges Stevenson's right to do just that.

Main Events has brought this lawsuit based on Stevenson's decision to fight one boxer over a fighter, Sergey Kovalev ("Kovalev"), promoted by Main Events, even though Main Events does not and could not claim that it can contractually bar Stevenson's choice. Instead, Main Events has sued Stevenson and his fellow Movants for tortiously interfering with a purported email "co-promotion agreement" plaintiff claims it had with Stevenson's promoter, defendant Groupe Yvon Michel, Inc. ("GYM"), for a Stevenson-Kovalev fight (Count IV). But Main Events inexplicably failed to disclose to the Court that its CEO expressly stated in the very email exchange on which its claim of a contract is based that the emails in fact did *not* form a contract. Recognizing the untenable basis of its "contract" theory, Main Events alternatively

---

[1]   Movants are not named in Counts I-III of the complaint. GYM and defendant Yvon Michel ("Michel") are separately moving to dismiss Counts I-III of the complaint. Defendant Golden Boy Promotions, Inc. ("Golden Boy") is named in Counts IV and V of the complaint and is represented by separate counsel, who will file a substitution of counsel and has indicated that Golden Boy will move to dismiss the complaint.

claims, "if [n]o [c]ontract is [f]ound," that Movants tortiously interfered with plaintiff's

prospective economic advantage (Count V), an equally untenable theory.

      Plaintiff's tortious interference with contract claim should be dismissed because

the complaint fails to plead the existence of a valid contract.  Plaintiff's "contract" was

purportedly formed in an email exchange on January 23, 2014 between the principals of Main

Events (Kathy Duva ("Duva")) and GYM (Michel).  But in the first email in the chain – which

plaintiff conspicuously chose not to attach to its complaint – Duva unequivocally stated:

> Of course, there will be *many details to cover* in a full deal
> memo and *subsequent contract*.  This message is *not* intended to
> represent our full agreement, but is merely intended to
> memorialize today's discussion.

(Freund Decl. Ex. 1 (emphasis added).)[2]  Michel responded by indicating that he too would

require a subsequent, detailed written contract in order to be contractually bound:

> If you don't mind we will have our attorney to make a
> proposed more detailed [sic].

(Freund Decl. Ex. 1.)  Accordingly, the January 23 email exchange is nothing more than a partial

discussion of a potential co-promotion agreement that was entirely contingent on additional

terms (or "details" in Duva's own words) and a subsequent, written contract.

      It is well-settled that "agreements to agree," let alone fragmented and tentative

discussions like the one here, are not contracts.  The law is equally clear that there can be no

contract in the absence of essential terms or a delineation of the obligations between the parties

so that they each understand what they are bound to do.  As Duva acknowledged herself, the

email exchange lacked "many details" that were needed to actually form a contract.  In short,

---

[2]    The January 23, 2014 email exchange is annexed as Exhibit 1 to the Declaration of
Jonathan Freund, dated July 7, 2014, submitted in support of the motion to dismiss of defendants
GYM and Michel.  As discussed below, the Court may consider such a document referenced in
the complaint on a motion to dismiss.

Main Events' tortious interference with contract claim fails because it did not plead the existence of a contract.

Both of plaintiff's tortious interference claims fail for the additional, independent reason that Main Events does not allege any facts to show that the Movants acted maliciously – that is, dishonestly, fraudulently, or illegally – and with the specific intent to interfere with Main Events' purported rights.  Shed of its entirely conclusory allegations, the complaint merely alleges that, with knowledge of the discussions between Duva and Michel, Stevenson decided he wanted to pursue an alternative fight against Bernard Hopkins ("Hopkins"); Haymon and Schaefer negotiated and pursued the alternate fight for Stevenson; GYM agreed to such a fight on behalf of Stevenson; and Showtime offered to telecast the alternate Stevenson-Hopkins bout. These allegations are woefully deficient because mere acts of business competition – even those that deprive the plaintiff of its own business opportunity – or acts that are in the pursuit of a defendant's own economic interests, without more, cannot sustain a tortious interference claim. Indeed, courts consistently reject efforts like Main Events' to blur the important distinction between competition on the one hand and *tortious* conduct on the other.

As to defendants Showtime and Stevenson, there are simply no well-pled allegations that either acted maliciously and with the specific intent to harm plaintiff.  As to Haymon, Main Events resorts to conclusory and defamatory allegations about Haymon's general business dealings with other boxers – suggesting that Haymon's business practices "violate" the Muhammad Ali Act, that his contracts with other boxers violate various states' laws, and that he never filed for a manager's license in certain states.  Main Events also baldly alleges that Haymon and Schaefer, a then-principal of Golden Boy, were engaged in a "scheme" to wrest control of Golden Boy from its other principal.  These sweeping accusations suggest that the

complaint's allegations have less to do with anything purportedly done to plaintiff, and far more to do with Main Events' efforts to try to tarnish Haymon's reputation and disrupt his broader business dealings.

On this motion to dismiss, we do not address the utter falsity of Main Events' *ad hominem* attacks on Haymon and Schaefer.  The dispositive issue here is that all of these allegations fail to sustain either tort claim.  Not only are they impermissibly conclusory statements, but it is irrelevant to plaintiff's tort claims whether Haymon has generally harmed other boxers because some contracts he has with them allegedly contain provisions that are unenforceable under some state law or purportedly violate a provision of the Muhammad Ali Act, as falsely alleged by Plaintiff.  It is similarly irrelevant to anything allegedly done to plaintiff if Haymon never filed for a manager's license in some states, or if Haymon and Schaefer were seeking control of Golden Boy.  Put simply, these far-flung allegations fail to show that the conduct of Haymon or Schaefer was malicious in connection with a specific intent to harm *Main Events*.

For these reasons, and as set forth in greater detail below, we respectfully submit that Counts IV and V of the complaint should be dismissed with prejudice in their entirety.

**BACKGROUND**[3]

A.  The Purported Contract Between Main Events and GYM

   According to the complaint, in late-2013 and early-2014, Main Events and GYM were discussing and negotiating a potential fight between Stevenson and Kovalev.  (Compl. ¶¶ 19-21.)  Plaintiff alleges that those discussions "culminated in conversations and an exchange of emails on January 23, 2014 where a co-promotion agreement was reached . . . ."  (Compl. ¶ 22.)

   In the first email from this exchange, Duva (Main Events' CEO (Compl. ¶ 12)) wrote at 1:53 pm that "we have agreed to the following splits [of television revenues], subject to the approval of our respective fighters" and described the splits of revenues from HBO, Canadian television, international broadcasts, and Russian television.  (Freund Decl. Ex. 1; *see also* Compl. ¶ 22(C).)  Duva also wrote that the "target date for the fight is Sept. 6th and we agree that we wish to pressure HBO to find a date in December for the winner."  (Freund Decl. Ex. 1.) Tellingly, Duva's email further identified several contracts that had not, but would need to be negotiated by one or both of the promoters and exchanged in connection with any fight, including broadcast, venue, merchandise, and pay-per-view (or "PPV") deals.  (Freund Decl. Ex. 1.)  The email exchange does not state which promoter was responsible for negotiating such contracts, and the complaint contains no allegations that any such division of responsibility was ever agreed to or undertaken.  In addition, according to Duva's email, Main Events and GYM

---

[3]  For purposes of this motion only, we assume the truth of the well-pled, non-conclusory allegations of the complaint.  Conclusory allegations and bald assertions need not be credited. *See, e.g.*, *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007).  The facts discussed herein are also drawn from documents that are annexed to or referenced in the complaint and/or integral to plaintiff's claims.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (on a Rule 12(b)(6) motion, a district court may consider documents integral to a complaint, even if not attached thereto).

had also agreed to pursue a rights fee in negotiations with HBO somewhere in the range of $2-3 million.  (Freund Decl. Ex. 1; *see also* Compl. ¶ 22(C).)

Significantly, Duva concluded her email by stating:  "Of course, there will be many details to cover in a full deal memo and subsequent contract.  This message is *not* intended to represent our full agreement, but is merely intended to memorialize today's discussion."  (Freund Decl. Ex. 1 (emphasis added).)  At 2:48 pm, Michel responded that he too wanted an actual detailed contract, to be proposed by his attorney:  "If you don't mind we will have our attorney to make a proposed more detailed [sic]."  (Freund Decl. Ex. 1.)  In his email, Michel also addressed what the complaint describes as "some additional less significant points."  (Compl. ¶ 22(B).)  The complaint fails to allege (because it cannot) that a more detailed proposal was ever made, let alone executed.

At 4:28 pm that same day, in response to Michel's email stating that he wanted his lawyer to make a detailed proposal and discussing his "less significant" points, Duva responded:  "This is acceptable to us."  (Freund Decl. Ex. 1; *see also* Compl. ¶ 22(E).)  She also reported that Kovalev, through his manager, had approved the television revenue split described in her 1:53 pm email.  Duva wrote:  "I have just spoken to Sergey's manager.  We have a deal on our end."  (Freund Decl. Ex. 1; *see also* Compl. ¶ 22(E).)  Michel replied to Duva's email conveying Kovalev's assent to the television revenue split at 8:06 pm, saying "We also have a deal on our side!! :-) Let's make a good sales to HBO and Peter new [sic]! :-)"  (Freund Decl. Ex. 1; *see also* Compl. ¶ 20(F).)  The "Peter" in Michel's 8:06 email was a reference to Peter Nelson of HBO, with whom Michel and Duva was scheduled to speak on January 24, 2014 about the HBO rights fees.  (Compl. ¶ 23.)  On January 24, GYM and Main Events negotiated a potential $2.4 million rights fee with HBO.  (Compl. ¶ 24.)

Plaintiff also alleges that after January 24, 2014, "Mr. Michel and other GYM representatives repeated verbally that there was an agreement in place to co-promote a Stevenson v. Kovalev bout.  Direct representations were made that acceptance had been approved by Mr. Stevenson and his attorney."  (Compl. ¶ 27; *see also, e.g.*, Compl. ¶ 29.)  Main Events further alleges through multiple layers of hearsay that Michel told Main Events that Haymon had acknowledged the "contract" in some way.  (Compl. ¶ 40.)[4]

B.    The Purported Interference

In conclusory fashion, Main Events alleges that the Movants "operated in bad faith and without legal justification or excuse, to cause GYM to breach its contract with Main Events."  (Compl. ¶ 94.)  Similarly, Main Events baldly alleges that the Movants "interfered with [the business relationship between plaintiff and GYM] using dishonest, unfair and/or improper means."  (Compl. ¶ 99.)  There are no factual allegations to sustain either conclusory assertion.

1.    Haymon & Schaefer[5]

Plaintiff alleges that Haymon, in conjunction with Golden Boy (through Schaefer), interfered with the purported contract by "negotiating an alternate bout and convincing GYM to agree to the alternate bout in derogation of its contract with Main Events"

---

[4]    The complaint also quotes from and attaches self-serving letters from Main Events' lawyer arguing that there was a contract formed on either January 23 or January 24.  (Compl. ¶ 28; Exs. A & B to Compl.)

[5]    Main Events alleges in entirely conclusory fashion that "on information and belief, Schaefer was collaborating with Haymon during the entire set of events described in this complaint as set forth elsewhere in this complaint."  (Compl. ¶ 89.)

and "convincing Stevenson to engage in the alternate bout" against Hopkins.  (Compl. ¶ 92; *see also* Compl. ¶ 41.)[6]

Main Events' remaining allegations as to Haymon oddly consist of conclusory and unsubstantiated attacks on Haymon's character and business dealings with others, or as to Haymon and Schaefer, the alleged internal politics of Golden Boy.  For example, unable to allege anything purportedly done intentionally to harm plaintiff, Main Events baldly alleges that Haymon is generally serving as both a manager and a promoter for boxers, purportedly in violation of the Muhammad Ali Act.  (Compl. ¶ 31; *see also* Compl. ¶ 43.)[7]

Plaintiff also attempts to inject into this case a purported rift within Golden Boy by alleging in conclusory fashion that "Haymon entered into an alliance with Richard Schaefer, then the CEO of Golden Boy.  Upon information and belief one object of this alliance was to wrest control of Golden Boy from Oscar De La Hoya for their own financial gain.  A second was to assist Haymon in violating the Muhammad Ali Act to further Haymon's promotional activities."  (Compl. ¶ 33.)  Main Events claims that as part of this effort to wrest control of Golden Boy, Schaefer "has in some instances relinquished and in other instances not required

---

[6]     Main Events also alleges that "Richard Schaefer announced that Golden Boy would promote or co-promote an Adonis Stevenson bout which would take place in lieu of a Stevenson/Kovalev bout."  (Compl. ¶ 89.)

[7]     Main Events also attaches a sample redacted copy of an Exclusive Advisory Agreement Haymon purportedly has with another boxer, and speculates that *if* Haymon has the same contract with Stevenson, it would give Haymon "veto power over who Stevenson may fight and for what promoter Stevenson will fight."  (Compl. ¶ 48; *see also* Ex. E to Compl.)  In conclusory fashion, Main Events opines that "[t]his contract form Haymon uses purports to be governed under California law but is violative of California statutes and regulations in several respects and was never placed on file with the California Athletic Commission as required."  (Compl. ¶ 48.) It also alleges that "Haymon contracts, required by New York law to be filed with the New York Athletic Commission, were not so filed" and that "[i]n certain states in which Haymon acts he never even filed for a manager's license."  (Compl. ¶ 48; *see also* Compl. ¶ 36.)  Main Events further alleges that "[u]pon information and belief, Haymon has not disclosed to fighters under management contracts with him of his intent to create a formed promotional entity using the contracts which he holds with them."  (Compl. ¶ 49.)

promotional agreements with fighters which Golden Boy has built into attractions, in violation of his fiduciary duties, relying instead only on Haymon's good will, placing the corporation in a weakened position." (Compl. ¶ 34.)  Main Events further claims that as part of this effort "Haymon and Schaefer must show potential investors assets, including fighter contracts, and control of fighters and major fights to show that there is substance to potential investors." (Compl. ¶ 35.)[8]

In similarly conclusory fashion, Main Events then contends that "[i]t is in connection with this scheme that Mr. Haymon's interference with Main Events' co-promotion agreement for the Stevenson/Kovalev bout becomes relevant." (Compl. ¶ 37.)  But the complaint does not allege facts relevant to plaintiff's tortious interference claims because all that Main Events alleges is that Haymon and Golden Boy (through Schaefer) were economically motivated to work with Stevenson because (a) a "management agreement" with Stevenson "is obviously a significant asset to show potential investors" and (b) an "agreement for a major bout between Bernard Hopkins and Mr. Stevenson" would be an even better asset.  (Compl. ¶ 38.)

2.   Showtime

Plaintiff alleges that Showtime is "a pay television  network" and is "the chief competitor to HBO." (Compl. ¶ 17.)  According to plaintiff, both Showtime and HBO "prominently feature[] boxing on their respective networks." (Compl. ¶ 17.)  Plaintiff's lone allegation with respect to Showtime is that it interfered with the contract between GYM and Main Events "by making an offer to Yvon Michel through Haymon to telecast an alternate event [the Stevenson-Hopkins bout] inconsistent with the co-promotion of a Stevenson/Kovalev bout . . . ." (Compl. ¶ 93.)  In this regard, plaintiff asserts in entirely conclusory and sweeping fashion

---

[8]     Main Events also alleges that "Mr. Hopkins' public announcements made it clear that he was aligned with Mr. Schaefer and with Mr. Haymon." (Compl. ¶ 52.)

that Showtime, with knowledge of the "contract" "made an offer, negotiated through Al Haymon to telecast a Stevenson/Hopkins bout with, inter alia, the clear intent of disrupting the Stevenson/Kovalev bout."  (Compl. ¶¶ 56-57.)  In similarly conclusory fashion, and without offering any well-pled facts, Main Events alleges that this conduct is "but one example of many" practices of Showtime that "assist[s] Haymon in violating the Muhammad Ali Act by bypassing licensed promoters."  (Compl. ¶ 58.)  There are simply no other allegations in the complaint with respect to Showtime's alleged interference.

        3.    <u>Stevenson</u>

The only thing Main Events claims Stevenson did himself to tortiously interfere was "refusing to proceed" with the Stevenson-Kovalev bout "with the knowledge that there was any [sic] agreement between GYM and Main Events which he had approved."  (Compl. ¶ 91.)

**ARGUMENT**

I.    **NEW JERSEY LAW GOVERNS BOTH TORTIOUS INTERFERENCE CLAIMS**

New Jersey law governs plaintiff's tortious interference claims.  Main Events is a New Jersey company, with its principal place of business in that state.  (Compl. ¶ 1.)  The only party alleged to have any permanent connection to New York is Showtime, which the complaint alleges has its principal place of business in New York.  (Compl. ¶ 7.)  The defendants are otherwise alleged to be organized or reside in Canada, Ohio, California, or Delaware, respectively.  (Compl. ¶¶ 2-8.)[9]

Main Events contends that it, as a New Jersey company, negotiated a contract with GYM, a Canadian entity, and that Main Events was harmed and denied the benefit of its purported bargain in New Jersey by defendants predominantly from outside of New York.  It is

---

[9]    The complaint also names eight "John Doe" defendants, who are each alleged to be non-New Jersey residents.  (Compl. ¶ 9.)

therefore clear that the alleged impact of and connection to the conduct underlying Main Events'

tort claims is predominantly centered in New Jersey, and that New Jersey law should apply.  *See*

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 287 n.32 (S.D.N.Y. 2002)

(applying New Jersey law to tortious interference claims because plaintiffs were located in New

Jersey and "the place of the wrong is where the injury occurred, New Jersey."), *rev'd in part on*

*other grounds*, 386 F.3d 485 (2d Cir. 2004); *see also Discover Group, Inc. v. Lexmark Int'l, Inc.*,

333 F. Supp. 2d 78, 85 (E.D.N.Y. 2004) (explaining that because the injuries that plaintiffs

alleged were suffered by plaintiffs "where they reside and do business," that jurisdiction's law

should apply to tortious interference claim).

## II.      **BOTH TORTIOUS INTERFERENCE CLAIMS SHOULD BE DISMISSED**

Plaintiff's claims for tortious interference with contract and tortious interference

with prospective economic advantage have the same pleading requirements, except of course that

Main Events must adequately plead the existence of a contract for its tortious interference with

contract claim.  *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d

249, 288 (D.N.J. 2003) ("The requirements for each claim are identical except that the tortious

interference with contractual relations claim requires proof of an existing contract.").

To state a claim for tortious interference, a complaint must adequately allege that:

(1) the plaintiff has a protectable interest, i.e., a valid contract with a third party, or reasonable

expectation of economic advantage; (2) the interference with that protected interest was

intentional and malicious; (3) the interference caused the loss; and (4) the plaintiff was damaged.

*Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989); *see also Johnson*

*& Johnson v. Guidant Corp.*, No. 06 Civ. 7685 (RJS), 2010 WL 571814, at *7 (S.D.N.Y. Feb.

16, 2010) (applying New Jersey law).

A.     **Main Events Has Failed to Adequately Allege the Existence of a Contract**

Plaintiff's contract allegations hinge on the January 23, 2014 email exchange, in which plaintiff contends a "co-promotion agreement was reached." (Compl. ¶ 22.)  But this email exchange contains express statements by the principals for *both* Main Events and GYM indicating that the emails did *not* form a contract and that each principal expected a formal, detailed, and written subsequent contract.

At 1:53 pm, Duva wrote:

> Of course, there will be *many details to cover* in a full deal memo and *subsequent contract*.  This message is *not* intended to represent our full agreement, but is merely intended to memorialize today's discussion.

(Freund Decl. Ex. 1) (emphasis added).  GYM's principal, Michel, responded at 2:48 pm, stating that he too would require a subsequent, written contract before being bound:

> If you don't mind we will have our attorney to make a proposed more detailed [sic].

(Freund Decl. Ex. 1.)  At 4:28 pm that same day, in response to this email from Michel, Duva responded:  "This is all acceptable to us."  (Freund Decl. Ex. 1; *see also* Compl. ¶ 22(E).)  No such contract was ever proposed or signed.

As Main Events' own principal stated, the discussions between GYM and Main Events left "many details" to be determined at some point in the future, and was contingent on a "full deal memo and subsequent contract."  It is well established that such incomplete and contingent discussions are not binding contracts.  *See Bressman v. J&J Specialized, LLC*, No. A-5550-11T1, 2013 WL 6331714, at *7 (N.J. Super. Ct. App. Div. Dec. 6, 2013) ("In general, the law treats an 'agreement to agree' upon material terms at a future time as an unenforceable indefinite promise."); *see also Brooklyn 13th St. Holding Corp. v. Nextel, Inc.*, 495 F. App'x 112, 113 (2d Cir. 2012) (explaining that an agreement that requires a party "to consider" doing

-12-

something does not obligate the party to actually do what it considers); *Kasower v. Gutowitz*, No. 00 Civ. 9011 (JGK), 2001 WL 1488440, at *5 (S.D.N.Y. Nov. 21, 2001) (dismissing breach of contract claim because the provision at issue was only an "indefinite agreement to agree" that was never finalized).

The decision in *Beals v. Bank of Am., N.A.*, No. 10 Civ. 5427, 2011 WL 5415174 (D.N.J. Nov. 4, 2011), is instructive.  In that case, the court dismissed a breach of contract claim where the parties developed a framework for a potential agreement, but the circumstances made clear that the parties had no intention to be contractually bound.  *Id*. at *11.  That framework – a form titled "Foreclosure Mediation Settlement Memorandum" – made clear that there was no binding agreement because the parties crossed out provisions that would have otherwise made the agreement binding, and any subsequent agreement was made contingent on the defendant's review and approval of financial documents related to a settlement.  *Id*.  The court explained that while the "defendants started negotiations and laid the groundwork for an agreement" the plaintiff failed to "assert facts raising the inference that they had a meeting of the minds sufficient to form an actual contract."  *Id*.  Similarly, here, while Duva and Michel generally discussed a potential co-promotion and a rights fee negotiation range, they each stated in writing their mutual intent not to be bound and their understanding that there was no contract.[10]

Also instructive is *Cotter v. Newark Hous. Auth.*, 422 F. App'x 95 (3d Cir. 2011).  There, the Third Circuit, applying New Jersey law, affirmed the dismissal of a breach of contract claim where the parties' exchange of letters discussing a real estate deal were nothing more than negotiations "simply setting the stage for the an [sic] actual agreement."  *Id.* at 98.  In one of the

---

[10]   Even plaintiff's self-serving February 19, 2014 letter to GYM tacitly concedes that the January 23, 2014 email did not form a contract because it outlined only the "general terms" of an agreement.  (Ex. A to Compl.)

letters, the defendant "agreed on the price, the time for diligence, and the building," but

explicitly noted that "subject to final approval by the [] Board of Commissioners, the [defendant]

*will* enter into a contract." *Id.* at 97-98 (citation omitted).  The court held that despite agreeing

on some terms, the defendant's use of the future tense ("will") made clear that it had no intention

to be bound in the absence of a subsequent agreement.  *Id.* at 98; *see also Prudential Ins. Co. of*

*Am. v. Hilton Hotels Corp.*, No. 95 Civ. 5575 (KMW), 1996 WL 340002, at *6-7 (S.D.N.Y. June

19, 1996) (although memorandum stated that it was "binding on the parties," it was

unenforceable because other portions of the memo indicated "a clear intention not to be bound . .

. absent the execution of future binding agreements"); *Frank v. Coldwell Banker Schlott Inc.*, No.

94 Civ. 8181 (MGC), 1995 WL 479441, at *2 (S.D.N.Y. Aug. 14, 1995) (purported agreement

that explicitly stated "[t]his memo seeks to serve as an outline for a contract to be drawn up at a

later date" clearly indicated an intent not to be bound, and thus constituted an unenforceable

"agreement to agree").  So too here, as Duva and Michel both expressed that any agreement was

contingent on a future contract that would address the "many details" that were unresolved.

   The absence of a contract is further evinced by Main Events' failure to plead

essential terms for the so-called co-promotion agreement.  For a contract to exist, its terms "must

be sufficiently definite" such that "the performance to be rendered by each party can be

ascertained with reasonable certainty." *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J.

1992) (internal quotations and citations omitted).  "Where the parties do not agree on one or

more essential terms . . . courts generally hold that the agreement is unenforceable." *Id.*; *see*

*also, e.g.*, *Cioffi v. City of Jersey City*, No. A-0660-10T3, 2011 WL 4916375, at *2 (N.J. Super.

Ct. App. Div. Oct. 18, 2011) (same); *Bloch v. Xanau Liu*, No. 11 Civ. 2055 (SRC), 2011 WL

1547513, at *3 (D.N.J. Apr. 21, 2011) (purported agreement not a contract because there were insufficient terms showing what services a doctor would be obliged to render).

        The complaint here fails to allege facts showing what the obligations of the putative parties would have been, or what terms existed to allow the parties to determine whether or not they had kept or breached all of their respective, unspoken obligations.  For instance, Duva's 1:53 pm email states that "[w]e will exchange all contracts with broadcasters, the venue, sponsors, merchandise deals, PPV deals, etc., in addition to PPV and box office reports." (Freund Decl., Ex. 1).  These are all contracts Duva acknowledged needed to be negotiated and exchanged, but there was no agreement on who would negotiate those contracts, or how the revenues from them would be used in promoting the fight or shared from, for example, sponsor or merchandising contracts.  Similarly, the complaint fails to allege any facts showing how the parties were to divide or share responsibilities in promoting the fight in Canada, in the United States, or elsewhere, let alone what steps were going to be taken to promote this putative fight with international promotion implications.  The indefinite nature of the parties' obligations is fatal to Main Events' claim.  *See Bloch*, 2011 WL 1547513, at *3 ("[T]he conversation and emails upon which the purported agreement between Plaintiff and [Defendant] was based are simply too indefinite, general and amorphous to constitute a legally enforceable contract."); *see also Kunica v. St. Jean Fin., Inc.*, No. 97 Civ. 3804 (RWS), 1998 WL 437153, at *5-6 (S.D.N.Y. Aug. 3, 1998) (omissions of terms leaving no basis or standard for deciding whether the purported agreement had been kept or broken are fatal to the claim of a contract).

        Ignoring the express disclaimer of a contract in Duva's emails and the "contract's" indefinite terms, the complaint selectively plucks other language from the emails to mask the clear absence of any binding agreement between the parties.  Specifically, the

complaint quotes Duva's 4:28 pm email stating:  "I have just spoken to Sergey's manager.  We have a deal on our end," (Compl. ¶ 22(E)), and Michel's 8:06 pm response:  "We also have a deal on our side!! :-)"  (Compl. ¶ 22(F).)

But Duva's own email makes plain that these statements merely concerned the split of television revenues.  In her 1:53 pm email, Duva claims the parties agreed to a split of television revenues:  "we have agreed to the following splits."  (Freund Decl. Ex. 1; *see* also Compl. ¶ 22(C).)  Duva stated that this particular division of revenues was "subject to the approval of our respective fighters."  (Freund Decl. Ex. 1.)  That approval needed to be obtained before speaking with a representative of HBO the very next day about the television revenue split.  (Compl. ¶¶ 23-24.)  Duva then reported Kovalev's approval at 4:28 pm.  (Freund Decl. Ex. 1.)  Michel subsequently reported Stevenson's approval of the revenue split and immediately addressed the need to speak with HBO in the wake of each fighter's approval of the revenue split:  "We also have a deal on our side!! :-)  Let's make a good sales to HBO and Peter new [sic]!"  (Compl. ¶ 22(F).)

In a tacit acknowledgement that the January 23 email exchange did not form a contract, the complaint alternatively pleads that the contract was formed instead on January 24, 2014 following the negotiation of the television splits with HBO.  (Compl. ¶ 26.)  Putting aside the shifting nature of plaintiff's contract formation theory, this conclusory and unsubstantiated legal allegation should be rejected.  Moreover, the television revenue splits were – in the very words of Main Events' own principal – merely one of "many more details" for such a promotion, for which both principals wanted a detailed, "subsequent contract."

Main Events' reliance on purported statements made after the so-called agreement was reached is equally unavailing.  Main Events alleges that on several occasions between

-16-

January 24 and some unspecified date of the supposed breach of contract by GYM, Michel and

some others indicated both verbally and in writing that an agreement had previously been

reached.  (Compl. ¶¶ 27-29.)  Tellingly, Main Events alleges no facts related to these post-

January 24 statements showing that additional terms or an actual contract were agreed to by all

the parties.

   In any event, as explained in *Cotter*, a communication from one party to another

indicating that the parties had previously reached a "contract" is a "legal conclusion, not a factual

one" and should be ignored on a motion to dismiss.  422 F. App'x at 98 (finding no contract,

despite letters between the parties discussing the existence of a contract, including plaintiff's

statement that "an agreement had been reached between the parties" and defendant's statement

that the parties had "previously negotiated an agreement").

  **B.**  **The Complaint Should Also Be Dismissed Because Plaintiff Fails to
Adequately Allege Malice and Intent**[11]

   Both tort claims should be dismissed because Main Events has failed to

adequately plead that any of the Movants acted (1) with "malice," i.e., that the Movants' conduct

towards Main Events was the type of fraudulent, dishonest, or illegal conduct that transgresses

generally accepted standards of morality or of law, and (2) with the intent to specifically injure

plaintiff's interests.[12]

---

[11]  The complaint's failure to adequately plead malice and intent is dispositive of both
tortious interference claims because each claim requires the same pleading of malice and intent.
*See, e.g.*, *Gaelick v. Conn. Gen. Life Ins. Co.*, No. 11 Civ. 2464 (SRC), 2011 WL 3794228, at *2,
*4 (D.N.J. Aug. 25, 2011).

[12]  For its tortious interference with contract claim, Main Events alleges that the Movants
"operated in bad faith and without legal justification or excuse" to cause GYM to breach its
contract with Main Events to co-promote the Stevenson-Kovalev bout.  (Compl. ¶ 94.)
Similarly, with respect to its tortious interference with economic advantage claim, Main Events
alleges that the Movants used "dishonest, unfair and/or improper means" to interfere with the
business relationship between GYM and Main Events.  (Compl. ¶ 99.)  Such conclusory and

1.    The Malice and Intent Requirements

To adequately plead malice, Main Events must allege facts showing that the

Movants engaged in "the intentional doing of a wrongful act without justification or excuse."

*Printing Mart*, 563 A.2d at 39 (internal quotations omitted); *Alboyacian v. BP Prods. N. Am.,*

*Inc.*, No. 9 Civ. 5143, 2011 WL 5873039, at *4 (D.N.J. Nov. 22, 2011).  A defendant's "conduct

must be both injurious and transgressive of generally accepted standards of common morality or

of law."  *Lamorte Burns & Co., v. Walters*, 770 A.2d 1158, 1170-71 (N.J. 2001); *see also R.A.*

*Intile Realty Co., v. Raho*, 614 A.2d 167, 187 (N.J. Super. Ct. L. Div. 1992) (defining malicious

conduct as conduct that is "unconscionable").[13]

Moreover, the defendant's malicious conduct must be undertaken with the

specific intent of interfering with Main Events' legal interests:  "A plaintiff seeking to recover

for tortious interference [must] show that the defendant *specifically intended* to interfere with

*that particular plaintiff*."  *Woods Corp. v. Signet Star Holdings, Inc.*, 910 F. Supp. 1019, 1032

(D.N.J. 1995) (emphasis added); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1170

(3d Cir. 1993) ("It is true that a plaintiff seeking to recover for tortious interference must show

that the defendant specifically intended to interfere with *that* plaintiff."); *New Skies Satellites,*

*B.V. v. Home2US Commc'ns., Inc.*, No. 13 Civ. 0200 (PGS), 2014 WL 1292218, at *11 (D.N.J.

Mar. 28 2014) (dismissing claim where the allegations failed to show malicious conduct "with

---

unsupported allegations fail to state a claim as a matter of law.  *See DiFolco v. MSNBC Cable*
*LLC*, 622 F.3d 104, 115 (2d Cir. 2010) (affirming 12(b)(6) dismissal of tortious interference
claim where allegations were "too conclusory, vague, and lacking in factual basis").

[13]    Courts typically consider allegations of "fraud[], dishonest[y], or illegal[ity]" as examples
of the type of "malicious" conduct a defendant must engage in, connected to an intent to harm
the plaintiff.  *Lamorte Burns*, 770 A.2d at 1171 (defendant gathering and using protected
information to effect a surprise weekend coup); *see also Printing Mart*, 563 A.2d at 40
(submitting false bids and disclosing plaintiffs' bids to other bidders); *DiMaria Constr. Inc. v.*
*Interarch*, 799 A.2d 555, 560 (N.J. Super. Ct. App. Div. 2001) (making false representations).

the specific intent of convincing those customers to decline renewal of their contracts"); *Gaelick*, 2011 WL 3794228, at *3 (no tortious interference where plaintiff failed to plead facts "that would support a finding that the defendant acted with the specific intent to injure the plaintiff and to interfere with its contract or prospective business relationship").

2.   Competition and Pursuing One's Economic Interests are Not Tortious Interference

In assessing whether malice and intent have been adequately pled in support of tortious interference claims, courts have been careful to differentiate acts of competition or the pursuit of a person's own economic interests from the type of improper conduct, aimed at specifically harming another that provides the critical basis for a tortious interference claim. Indeed, courts have repeatedly held that mere acts of competition or a party's actions in pursuit of its own interest and own financial benefit cannot sustain a showing of malice and intent.  *See Foxtons, Inc. v. Cirri Germain Realty*, No. L-1421-06, 2008 WL 465653, at *7 (N.J. Super. Ct. App. Div. Feb. 22, 2008) ("[T]he fact that a party acted to advance its own interest and financial position does not establish the necessary malice or wrongful conduct."); *Johnson & Johnson*, 2010 WL 571814, at *9 (where a defendant's behavior is "merely an 'incident of healthy competition,'" it is "not actionable under New Jersey law") (internal citation omitted); *Mu Sigma v. Affine, Inc.*, No. 12 Civ. 1323 (FLW), 2013 WL 3772724, at *5 (D.N.J. July 17, 2013) (explaining that if the Court were to infer that defendant acted for the purpose of decreasing competition or advancing its own financial interest, "that inference would still be insufficient to establish the existence of malice").  Moreover, "[w]hen a business targets its competitor's customers, it exercises a valid business judgment and that alone does not constitute tortious interference . . . ." *Foxtons*, 2008 WL 465653, at *7; *see also Alboyacian*, 2011 WL 5873039, at *4 (allegations concerning defendant's decision to terminate certain contracts could support a

-19-

finding of ill will, but, because the actions were taken for business reasons, they were insufficient to rise to the level of malice required to sustain a claim).

       3.     The Movants' Alleged Conduct Cannot Sustain Either Tort Claim

Shorn of its conclusory allegations, the complaint fails to allege facts showing that any of the Movants acted maliciously, with the specific intent of harming Main Events. Instead, all the complaint alleges is that each of the Movants played some role and had some economic business incentive in pursuing or facilitating an alternative bout for Stevenson against Hopkins. Seeking such competitive alternatives or providing economic services to facilitate such alternatives does not constitute *tortious* interference.

       (a)     Haymon & Schaefer

Plaintiff alleges that Haymon and Golden Boy (through Schaefer) knew about the purported GYM-Main Events "contract," but negotiated a Stevenson-Hopkins bout, and convinced GYM and Stevenson to agree to that bout. (Compl. ¶ 92.) In other words, Haymon and Golden Boy (through Schaefer) pursued their own business opportunities and those of Stevenson by going out into the market and negotiating an alternative, competitive proposal for Stevenson.

Main Events' claim that it lost a business opportunity for a Stevenson-Kovalev bout as a result fails to state a claim for tortious interference because where, as here, plaintiff's loss is "merely the incident of healthy competition" it cannot constitute a "compensable tort injury." *Foxtons*, 2008 WL 465653, at *7 (no interference where plaintiff's losses resulted from defendant's publication of a flyer extolling the virtues of its own services in comparison to those provided by other brokers); *Moose Mountain Toymakers Ltd. v. Majik Ltd.*, No. 10 Civ. 4934 (DMC)(JAD), 2011 WL 3625057, at *4 (D.N.J. Aug. 12, 2011) (no interference where defendant did nothing more than offer plaintiff's retailer a better price for a similar product).

Unable to allege that Haymon and Schaefer acted maliciously in connection with a specific intent to harm Main Events, plaintiff resorts instead to conclusory and defamatory attacks about their purported conduct towards *other people*.  All of these allegations – that Haymon violates the Ali Act (Compl. ¶¶ 31, 33-35); that Haymon and Schaefer are involved in some internal power struggle at Golden Boy (Compl. ¶¶ 33-35); or that Haymon's contracts with some other boxers are violative of certain states' laws or regulations (Compl. ¶¶ 36, 48-49) – are conclusory statements that cannot be credited on a motion to dismiss.[14]

Moreover, these allegations simply are not a substitute for Main Events' obligation to make well-pleaded factual allegations showing that Haymon engaged in malicious conduct in his negotiations with Showtime, or interactions with GYM or Stevenson in securing the fight with Hopkins, all with a specific intent to harm *Main Events*.  It is irrelevant to plaintiff's tort claims whether or not Haymon's general business dealings collaterally violate the Ali Act or some unspecified aspects of state law to the detriment of boxers, or whether Haymon and Schaefer were intending to influence control of Golden Boy.

The recent decision in *Alboyacian*, 2011 WL 5873039, is particularly instructive. In that case, a number of franchisees alleged that BP tortiously interfered with the franchisees' contracts with third parties, and with their prospective economic advantages, by deciding to terminate those franchises with BP and by subjecting the franchisees to onerous standards of performance.  *Id*. at *4.  In arguing that BP's conduct was malicious, the franchisees alleged that BP's decision to terminate the franchises violated the New Jersey Franchise Practices Act,

---

[14]     These allegations about Haymon's contracts and general business practices are not only impermissibly conclusory, but also misleadingly stated and entirely circular.  Main Events is recasting (through conclusory allegations) Haymon's Exclusive *Advisory* Agreement into a "managerial" contract, or asserting that Haymon was a promoter and not an advisor or manager, and then alleging in equally conclusory and circular fashion that Haymon failed to comply with laws governing managerial contracts or promoters.  (*See, e.g.*, Compl. ¶¶ 31, 36, and 48.)

-21-

N.J.S.A. § 56:10-1, *et seq.*, ("NJFPA"), which governs the creation of legal franchises in New Jersey. *Id.* at *4. The court held that even though BP's conduct "could support a finding of ill will," such allegations could not be characterized as malicious for purposes of a tortious interference claim. *Id.* In granting BP's motion to dismiss, the court held that whether BP's actions actually violated the NJPFA "d[id] not matter" for the purposes of its malice inquiry, since there were "no allegations even suggesting that BP has engaged in fraudulent, dishonest, or illegal activity with respect to" BP's alleged interference, i.e., "the decision to terminate the franchises or the decision to shift certain responsibilities of performance onto the franchise owners." *Id.*; *see also Mu Sigma, Inc.*, 2013 WL 3772724, at *4 (conclusory allegations that defendant misappropriated and exploited sensitive business information held insufficient because there were no factual allegations showing how the defendant's conduct was intentionally connected to the alleged interference). Similarly, here, there are no well-pled factual allegations that Haymon or Schaefer acted maliciously in connection with the specific intent to harm Main Events.

(b)    <u>Showtime</u>

Main Events does not even attempt to allege facts showing that Showtime acted maliciously and with the specific intent to harm plaintiff. Main Events' singular allegation is that Showtime, knowing that there was a contract between Main Events and GYM, "made an offer, negotiated through Al Haymon to telecast a Stevenson/Hopkins bout with, <u>inter alia</u>, the clear intent of disrupting the Stevenson/Kovalev bout." (Compl. ¶ 57; *see also* Compl. ¶ 93.)[15]

---

[15]     Main Events makes the sweeping allegation that this offer is "but one example of many" practices of Showtime that "assist[s] Haymon in violating the Muhammad Ali Act by bypassing licensed promoters." (Compl. ¶ 58.) This conclusory allegation cannot be credited on a motion to dismiss. Moreover, this allegation, is factually inconsistent with other allegations in the complaint. Main Events alleges that Haymon was working with Golden Boy (who promoted Hopkins) (Compl. ¶ 41), and for Stevenson (promoted by GYM) and that GYM agreed with

Putting aside the falsity of this allegation, Main Events' conclusory generalization about

Showtime's "clear intent" cannot, of course, be credited on a motion to dismiss.  *See Masefield*

*AG v. Colonial Oil Indus.*, No. 05 Civ. 2231 (PKL), 2006 WL 346178, at *4 (S.D.N.Y. Feb. 15,

2006) (granting motion to dismiss tortious interference claim where allegations that counter-

defendants acted "with dishonesty and unfair means" to "intentionally induce[]" the breach, were

without factual underpinnings).

   Moreover, the alleged offer to televise the Stevenson-Hopkins bout is precisely

the type of permissible competitive act the law protects from overreaching tort claims.  As Main

Events concedes in the complaint, Showtime is "the chief competitor to HBO," and "prominently

features boxing" on its network.  (Compl. ¶ 17.)  Moreover, Main Events alleges that it had been

negotiating the Stevenson-Kovalev bout with Showtime's competitor, HBO, and wanted future

fights with HBO.  (Compl. ¶¶ 20 and 22-24.)  Showtime's pursuit of its own economic interests

by making a competitive offer to televise and feature an alternate boxing match – something that

plaintiff concedes that Showtime is in the business of doing – without more, cannot sustain Main

Events' tort claims, the effect of which requires dismissal.  *See, e.g.*, *Alboyacian*, 2011 WL

5873039, at *4 ("[A]llegations that [defendant's] actions are disadvantageous to [plaintiffs] and

advantageous to [defendant] are similarly insufficient – actions taken for business reasons are not

unjustified.").

   (c)  <u>Stevenson</u>

   Stevenson's decision not to fight Kovalev cannot sustain either of Main Events'

tort claims because there are no factual allegations showing that it was malicious and with the

specific intent to injure Main Events.  Plaintiff alleges merely that Haymon was negotiating the

what Haymon accomplished with Showtime.  (Compl. ¶ 39, 41.)  There are no well-pled factual
allegations showing that Haymon or Showtime "bypassed" GYM or Golden Boy.

televising of a Hopkins-Stevenson bout on Showtime.  (Compl. ¶ 41.)  GYM then presented a Showtime proposal for an "interim bout" – a fight before Stevenson fought Hopkins – against a fighter named Andrjez Fonfara, to HBO.  (Compl. ¶ 44.)[16]  Main Events concedes that it had "no interest" in (and therefore was not harmed by) the Fonfara-Stevenson bout.  (Compl. ¶ 46.)  Notably, the complaint alleges that Haymon obtained a rights fee in the Showtime proposal for a Fonfara-Stevenson bout that "was significantly above market value," and that Stevenson seized that above market opportunity.  (Compl. ¶ 45.)

The complaint otherwise only alleges that (with knowledge of a purported contract) Stevenson decided not to fight Kovalev (Compl. ¶ 91), and instead intends to fight Hopkins on Showtime.  (Compl. ¶ 47.)  Main Events cannot use the guise of tortious interference claims to prevent Stevenson from pursuing another personally beneficial economic opportunity in the fleeting time of his boxing career.  *See, e.g.*, *Fintech Consulting v. Clearvision Optical Co.*, No. 12 Civ. 4956 (DMC)(JAD), 2013 WL 1845850, at *6 (D.N.J. Apr. 30, 2013) (decision to pursue an alternate business opportunity that was not otherwise prohibited failed to constitute tortious interference).

## CONCLUSION

For the reasons set forth above, the Movants respectfully submit that Counts IV and V of the complaint should be dismissed with prejudice in their entirety.

---

[16]     GYM gave HBO the right to match Showtime's proposal because of a "right to match" clause in a contract GYM had with HBO that is not at issue in this case.  (Compl. ¶ 44.)

Dated:   New York, New York
         July 7, 2014

                                        Kramer Levin Naftalis & Frankel LLP


                                        By:_____/s/ Barry H. Berke_____
                                                 Barry H. Berke
                                                 Steven S. Sparling
                                                 Philip Ellenbogen

                                        1177 Avenue of the Americas
                                        New York, New York 10036
                                        (212) 715-9100

                                        *Attorneys for Defendants Al Haymon,*
                                        *Showtime Networks Inc., Adonis Stevenson*
                                        *and Richard Schaefer*